# In the United States Court of Federal Claims

No. 13-15C
(Filed: July 31, 2013)

FILED

JUL 31 2013

U.S. COURT OF
FEDERAL CLAIMS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CLYDE CALVIN GRADY,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OPINION AND ORDER

BRUGGINK, *Judge*.

    Plaintiff, appearing *pro se*, filed his complaint on January 7, 2013. In it he alleges that he lost $106,935.62 as a result of the stock market "Flash Crash." He claims that by failing to prevent the Flash Crash, the Securities and Exchange Commission breached an implied-in-fact contract with, and a fiduciary duty toward, investors in the U.S. stock market, both of which obligations he says are established by the Commission's statutory duty to maintain "fair and orderly markets." Compl. 4. Defendant has moved to dismiss, arguing that the court lacks subject matter jurisdiction over the complaint.[1] For the reasons set forth below, we grant the motion to dismiss.

### BACKGROUND

    Plaintiff alleges that on May 6, 2010, he sustained a financial loss when the Dow Jones Industrial Average dropped almost a thousand points in less

---

1. Defendant also moved to dismiss for failure to state a claim. We need not consider that basis for dismissal, however, because of the complaint's jurisdictional deficiency.

than half an hour in what has been called the "Flash Crash." According to the chairman of the Securities and Exchange Commission (SEC), "individual investors suffered losses of more than $200 million" as a result of the backfiring of a widely used investment tool known as a "stop loss order." Compl. 4. Designed as a means to limit losses by selling a stock when it drops below a certain price, the fundamental premise of stop loss orders, according to the SEC chairman, "is to rely on the integrity of market prices to signal when the investor should sell a holding." *Id.* That reliance "proved misplaced" on May 6, 2010, when "more than $2 billion in individual investor stop loss orders is estimated to have been triggered during the half hour between 2:30 and 3p.m." *Id.*

Plaintiff asserts that his brokers sold shares of stocks he owned "at prices far below their actual value," yielding a loss to plaintiff of $106,935.62. Compl. 4. Plaintiff argues that, if the government had not breached its contractual and fiduciary duties to him, it could have prevented the Flash Crash, averting this large financial loss to himself and others. He now petitions this court for compensation.

## DISCUSSION

Jurisdiction must be established before the court may proceed to the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998). Under the Tucker Act, 28 U.S.C. §1491(a)(1) (2006), this court is authorized to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." This jurisdiction extends only to claims for money damages. *See United States v. Testan*, 424 U.S. 392, 398 (1976). The Tucker Act itself is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *Id.* For plaintiff to prevail on his claim, he must identify "a substantive right for money damages against the United States separate from the Tucker Act," some source of law that is money mandating within the terms of that statute. *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004).

Complaints filed by *pro se* litigants are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). However, *pro se* status "does not relieve a *pro se* plaintiff from meeting jurisdictional requirements." *Bernard v. United States*,

59 Fed. Cl. 497, 499 (2004), *aff'd*, 98 Fed. Appx. 860 (Fed. Cir. 2004) (unpubl. Table). This is certainly the case when a plaintiff attempts to invoke the jurisdiction of the Court of Federal Claims, for the Tucker Act only "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and . . . waives the Government's sovereign immunity for those actions." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). When a plaintiff relies upon a statutory claim, the statute must contemplate that individuals in plaintiff's position are entitled to the payment of money. If the statute purportedly granting plaintiff a substantive right to recovery is not money mandating, the court "shall dismiss the cause for lack of jurisdiction, a Rule 12(b)(1) dismissal." *Id.* Alternatively, if the plaintiff alleges the existence of a contractual duty, he must plead the basic elements of a binding contract, entered into by persons authorized to form contracts.

Plaintiff asserts that by failing to prevent the Flash Crash, the SEC either violated the terms of a statutorily-derived fiduciary duty that can be inferred from the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. §78a–78nn (2012), or breached an implied contract with investors in the U.S. stock market arising from the same legislation.

I. Implied-In-Fact Contract

Plaintiff correctly notes that the court's Tucker Act jurisdiction includes claims based on an implied-in-fact contract with the government. *United States v. Mitchell*, 463 U.S. 206, 215 (1983) ("*Mitchell II*") (citing 28 U.S.C. §1491). Plaintiff alleges that the 1934 Act creates such a contract between the federal government and investors in the U.S. stock market. According to his complaint, investors provide capital needed to support the country's economy in exchange for the government's obligation to maintain "fair and orderly markets." Compl. 4. But the language of the 1934 Act does not establish an implied-in-fact contract because it does not express any contracting intent on the part of the government.

Where one party's rights and another's obligations are prescribed by statute rather than "the mechanics of a bilateral exchange, there is no contract in the usual sense of that word." *Chattler v. United States*, 632 F.3d 1324, 1331 (Fed. Cir. 2011) (quoting *Clawson v. United States*, 24 Cl. Ct. 366, 370 (1991)); *see also Agredano v. United States*, 595 F.3d 1278, 1281 (Fed. Cir. 2010) (holding that regulatory responsibility of U.S. Customs and Border Protection to remove contraband from vehicle before selling it at forfeiture

auction does not allow buyer to claim implied-in-fact warranty that vehicle is free of contraband). Contractual obligations within the terms of the Tucker Act do not arise simply from an agency's legal obligation to fulfill certain statutory functions. The elements of a contract—mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance, and the authority of the government representative whose conduct is relied upon to bind the government in contract—all must be present. *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003).

The court need not consider whether all the elements of a contract are present here, because it is plain that there is no statutory language to indicate that Congress intended to bind itself in a contract with investors by creating the SEC. The 1934 Act makes numerous references to the SEC's objective of maintaining "fair and orderly markets,"[2] but these are general proscriptions to keep this objective in mind when enacting regulations. *See, e.g.*, 15 U.S.C. §78f(f)(2) ("The Commission, . . . to maintain fair and orderly markets . . . may require any broker or dealer not a member of a national securities exchange effecting transactions on such exchange on a regular basis, to comply with such rules of such exchange as the Commission may specify."). None of the uses of this phrase can reasonably be construed to constitute a promise that the Commission's efforts will be successful[3] or as a guarantee to investors that markets will be "fair and orderly," however this term is defined. *Cf. Chattler*, 632 F.3d at 1330 (option to "request" expedited passport processing on State

---

2. The 1934 Act references this objective in the following locations: 15 U.S.C. §§78f(f), 78f(h)(4)(A), 78f(h)(4)(B), 78f(k)(1), 78i(h), 78i(h)(2), 78k(a)(1)(G), 78k(a)(1)(I), 78k(a)(2), 78k(b), 78k-1(a)(2), 78k-1(b)(1), 78k-1(c)(1)(D), 78k-1(c)(3)(A)(iii), 78k-1(c)(3)(A), 78l(f)(1)(C), 78l(f)(1)(D), 78l(f)(1)(E)(i), 78l(f)(2)(A)(i), 78l(f)(2)(A)(ii), 78l(k)(2)(A)(i), 78l(k)(7)(A)(i)(I), 78m(f)(4), 78o(c)(5), 78o(g)(5), 78q-2(a)(2), 78q-2(c), 78s(b)(3)(B) (2012).

3. Nor does an alleged statement on the SEC website that it is the "mission" of the SEC to "maintain fair, orderly, and efficient markets" create an implied-in-fact contract, as plaintiff asserts. Compl. 4. A "mission" is a promise to try, not a promise to succeed. The website's use of the passive voice—"The mission of the [SEC] is to . . . maintain fair, orderly, and efficient markets" instead of, for example, "the SEC will maintain fair, orderly, and efficient markets"—is further evidence that the government does not intend to be contractually bound. *See Chattler*, 632 F.3d at 1331 (use of passive voice on passport form makes it less likely that government intended to be bound).

Department form "belies any obligatory intent" on part of government), *Agredano*, 595 F.3d at 1281 (holding that government had no contractual obligation to remove contraband from vehicle before forfeiture sale, even though government had a regulatory duty to do so).

Adopting plaintiff's contractual view of the SEC's obligations to investors would turn the government into a guarantor against losses in the stock market. Because the elements of an implied-in-fact contract are not present in the 1934 Act, no implied in fact contract could have been formed between plaintiff and the government.

II. Fiduciary Duty

Plaintiff correctly asserts that this court has Tucker Act jurisdiction over claims founded on a fiduciary duty the government owes an individual or group of citizens. *Mitchell II*, 463 U.S. at 211. He argues in his complaint that the 1934 Act imposes a fiduciary duty on the SEC to investors to maintain "fair and orderly markets." Compl. 4. The SEC has no such duty, however, because the statute does not establish any sort of trust relationship that benefits investors.

As a sovereign entity, the federal government's fiduciary duties are not defined by the common-law conception of a trust relationship. Instead, a fiduciary duty only arises if it is plain from the relevant statutes or regulations that the government has accepted such a responsibility. *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2323, 2325 (2011). This is true even when a statute refers to a relationship in terms of a trust. *Id.* at 2323 (citing *United States v. Mitchell*, 445 U.S. 535, 542 (1980) ("*Mitchell I*"); *Mitchell II*, 463 U.S. at 224).

*Mitchell II*, on which plaintiff relies, involves a lawsuit by Native Americans against the United States for alleged breaches of trust in connection with federal management of forest resources on the Quinault Indian Reservation. 463 U.S. at 207. Ruling in favor of the plaintiffs, the Supreme Court noted that the statutory and regulatory provisions allowing the government to harvest and sell timber on the reservation "directly support[] the existence of a fiduciary relationship." *Id.* at 224. First, the statutes and regulations in question expressly subject the forest resources to a trust, mandating that timber sales be based on "the needs and best interests of the Indian owner and his heirs," with proceeds paid to owners "or disposed of for their benefit," and that the forests be managed to "obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the

forests." *Id.* (respectively quoting 25 U.S.C. §406(a) and U.S. Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations 4 (1911)); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474–75 (2003) (United States had fiduciary duty to maintain property it held in trust for White Mountain Apache Tribe pursuant to Pub. L. 86-392, which "expressly defines a fiduciary relationship in the provision that [the property] be 'held by the United States in trust for the White Mountain Apache Tribe'").

Second, the government assumed "elaborate control" over the corpus of the trust . *Mitchell II*, 463 U.S. at 225. In *Mitchell II*, "[v]irtually every stage" of the process of harvesting and selling timber on the reservation was "under federal control" per duly enacted statutes and regulations. *Id.* at 222; *see also White Mountain Apache*, 537 U.S. at 475 (fiduciary duty proceeds from the fact that the statute invested the federal government with authority to make "direct use" of the property it held in trust, and that the government "has not merely exercised daily supervision but has enjoyed daily occupation" of the property). In both *Mitchell II* and *White Mountain Apache Tribe*, the Court held that the government had a fiduciary obligation by virtue of having expressly undertaken one by statute or regulation. Contrasting these cases is the *Mitchell I* decision. In that case, the Court determined that the General Allotment Act of 1887 "d[id] not impose any [fiduciary] duty upon the Government," because the statute indicated that "the allottee, and not the United States, was to manage the land" held in trust. 445 U.S. at 542–43.

The United States' relationship with stock market investors is in no way comparable to the trust responsibilities it undertook with the Native American tribes in *Mitchell II* and *White Mountain Apache*. The government has not undertaken any fiduciary duties in the 1934 Act. Congress sought to regulate securities transactions because they affect the "national public interest," 15 U.S.C. §78b (2006), but not explicitly for the benefit of investors themselves. Moreover, the SEC's function in the stock market is nothing like the "pervasive role" the Interior Department played in the management of Quinault forest resources in *Mitchell II*, 463 U.S. at 219. Plaintiff alleges that the 1934 Act empowers the SEC to "issue rules governing the structure and operation of the U.S. Stock Market." Compl. 4. Issuing ground rules for a stock exchange is perhaps analogous to the role of refereeing a football game. The referee enforces rules, but the respective teams are responsible for their own conduct. The referee does not make choices about strategy or tactics. The coaches and players make those decisions, just like individual investors and advisors make those decisions in the market. The SEC does not hold

securities[4] and make investment decisions on behalf of private stock owners. None of the indicia of a trust relationship are present. Because the government has not undertaken a fiduciary relationship with investors through the 1934 Act, this statute is not money mandating within the terms of the Tucker Act.

## CONCLUSION

The 1934 Act does not create an implied-in-fact contract between the U.S. government and investors in the U.S. stock market, nor does it establish a fiduciary duty on the part of the government to investors. The statute therefore is not money mandating within the terms of the Tucker Act, meaning this court lacks subject matter jurisdiction over plaintiff's claim. *Fisher*, 402 at 1172.

Accordingly, defendant's motion to dismiss is granted. The Clerk of the Court shall dismiss the complaint without prejudice for lack of subject matter jurisdiction. No costs.

*[signature]*
ERIC G. BRUGGINK
Judge

---

[4] Even holding legal title to investors' securities alone, which the SEC does not, would be insufficient to establish a fiduciary duty. *See Mitchell I*, 445 U.S. at 542 (even a "limited trust relationship" in which, for example, the government holds title to property but does not manage or use it directly, is insufficient to establish fiduciary duty).